UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6247-CR-FERGUSON

UNITED STATES OF AMERICA,

Plaintiff,

vs.

WAYNE BRUTON,

Defendant.
_____/



## DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT AND MOTION FOR DOWNWARD DEPARTURE

The Defendant, Wayne Bruton, through undersigned counsel, respectfully moves for a downward departure from the otherwise applicable guideline offense level, and in support thereof, the defendant states:

### Factual Background

The offense conduct section of the PSI describes two sales of crack cocaine to a government confidential source. The total amount of crack cocaine involved in this case in 29.6 grams. Mr. Bruton proffers that the confidential source is Bernard Terry, the defendant's former next door neighbor. Mr. Bruton further proffers that shortly before the first transaction, Mr. Terry approached him and expressed interest in purchasing Mr. Bruton's Chevrolet Impala. Terry advised Bruton that there were some individuals from out of town who wanted to purchase five kilograms of cocaine. Mr. Terry went on to explain to Mr. Bruton that he planned to sell the individuals five kilograms of fake cocaine, but he needed Bruton to obtain some cocaine that the people from out of town could sample. Mr. Terry further explained that he needed crack cocaine so he could show the individuals

how well the powder cocaine could be transformed into crack.

The first transaction occurred on March 9, 2000. The confidential source contacted Mr. Bruton for the purpose of purchasing one ounce of crack cocaine. Mr. Bruton met with the confidential source and showed the confidential source ten grams of powder cocaine. See excerpt from transcript of March 9, 2000 transaction, hereto attached as defendant's exhibit 1. The confidential source then asked Mr. Bruton to cook the powder. Mr. Bruton replied, "I don't know how to cook no powder, dog, you know I don't know how to cook no powder. "Bitch, I don't cook nothing but (unintelligible) in the house."

At the confidential source's insistence for crack cocaine, Mr. Bruton went over to a nearby basketball court and approached several street dealers and asked them to give him their crack cocaine. Mr. Bruton was also able to obtain an additional amount of crack cocaine from an unidentified male known as "Brucie." Mr. Bruton then sold the total amount of crack cocaine to the confidential source for $750.00. According to the laboratory report provided in the government's discovery response, Mr. Bruton delivered a total amount of 12.4 grams of crack cocaine on March 9, 2000.

On March 16, 2000, the confidential source met with Mr. Bruton to purchase cocaine. See PSI ¶ 9. Mr. Bruton telephoned an unknown individual in the presence of the confidential source to deliver the cocaine and advised the confidential source that the person would be delivering powder cocaine. Again, the confidential source advised Mr. Bruton that he was only interested in crack cocaine. After waiting for approximately an hour and a half, the confidential source left the location before the cocaine was delivered. On March 29, 2000, Mr. Brutton sold the confidential source an amount of crack cocaine for $400.00. See PSI ¶ 11. According to the laboratory report provided

2

in the government's discovery response, the amount of crack cocaine delivered on this date was 17.2 grams.

## Sentencing Entrapment, Sentence Factor Manipulation or Imperfect Entrapment

Sentencing entrapment or sentence factor manipulation occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped into committing a greater offense which is subject to greater punishment. United States v. Castaneda, 94 F.3d 592 (9th Cir. 1996). There are two possible remedies for sentencing entrapment or sentence factor manipulation. First, a sentencing court may decline to apply the statutory penalty provision for the greater offense that the defendant was induced to commit, and instead apply the penalty provision for the lesser offense that the defendant was predisposed to commit. Alternatively, the sentencing court may grant a downward departure from the sentencing range for the greater offense that the defendant was induced to commit. United States v. Riewe, 165 F. 3d 727, 729 (9th Cir. 1998).

The Eleventh Circuit distinguishes sentencing entrapment from sentencing manipulation. See United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998). While sentencing entrapment focuses on the defendant's disposition, sentencing factor manipulation focuses on the conduct of the individuals. Id. Sentencing factor manipulation requires the court to consider whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense or a due process claim must sometime be filtered out of the sentencing calculus Id. (citing United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1996)). Although the Eleventh Circuit has rejected sentencing entrapment as a viable defense, See United States v. Miller, 71 F.3d 813 (11th Cir. 1996), the Eleventh Circuit has implicitly recognized sentencing factor manipulation as a ground for downward departure under the appropriate circumstances. See Sanchez, 138 F.3d at 1414.

3

In Sanchez, the defendants were convicted of a conspiracy to possess with intent to distribute cocaine and marijuana. Id at 1412. The charges grew out of a government created reverse sting scenario by which the defendant agreed to invade and steal drugs from a house they thought contained illegal drugs when in fact there was no house and there were no drugs. Id. Law enforcement agents told the defendants that 50 kilograms of cocaine would be found at the fictitious location. Id. The defendant's appealed their sentences arguing, inter alia, that because the amount of drugs used for sentencing purposes was the amount of drugs set by a government informant at the direction of a government agent, a downward departure under the theory of sentence factor manipulation was warranted. Id. at 1413.

In addressing the sentence factor manipulation argument, the Sanchez court found that the Eleventh Circuit had not previously directly addressed the theory and the defendants had not raised the theory as a basis for downward departure at the trial level. Id. at 1414. However, the Sanchez Court went on to state that had the issue been properly before the court, the government's conduct in the fictitious reverse sting did not amount to the type of manipulative conduct warranting a downward departure at sentencing. Id. Mr. Bruton respectfully submits that the government conduct in this case is the type of conduct which warrants a downward departure for sentence factor manipulation.

The government's confidential source insisted that Mr. Bruton provide crack cocaine even though Mr. Bruton offered to sell powder cocaine and advised that he did not know how to cook crack cocaine. Mr. Bruton submits that law enforcement agents instructed the confidential source to persuade or induce Mr. Bruton to sell only crack cocaine because the penalties for selling relatively small quantities of crack cocaine are substantially higher than the penalties for selling the

4

same quantities of powder cocaine.

In both transactions, the confidential source made the initial contact with Bruton. Although the government claims that Bruton was targeted due to their belief that he was selling crack cocaine from his residence, it is apparent from the facts surrounding the transactions that Mr. Bruton was not a frequent distributor of crack cocaine. Nor did Mr. Bruton reap any benefit from the cocaine deals he made with the confidential source. Mr. Bruton was paid a total of $1150.00 for the two transactions. This amount does not include the expenditures Mr. Bruton made to acquire the cocaine. It is doubtful that Mr. Bruton made any profit on the two transactions. It appears that the focus of the government's investigation was to provide the confidential source with grounds for a substantial assistance motion as opposed to ridding the community of a crack cocaine dealer. Alternatively, the government's focus was to place Mr. Bruton in a position whereby he would be forced to provide substantial assistance to the government.

Accordingly, Mr Bruton respectfully requests that this Court downward depart from the otherwise applicable guideline range because the government's conduct in this case constitutes sentence factor manipulation. See United States v. Martinez-Villegas, 993 F.Supp 766 (C.D. Cal. 1998)(downward departure granted when government induced defendant to deliver 92 kilograms of cocaine when defendant showed disposition to deliver 10 to 15 kilograms).

## Over-representation of Criminal History

A sentencing court may depart downward from the offense level axis and/or the criminal history axis of the sentencing table regardless of a defendant's career criminal status. See United States v. Webb, 139 F.3d 1390, 1395 (11th Cir.1998) (citing United States v. Shoupe, 35 F.3d 835, 839 ( 3rd Cir. 1994)). The guideline provision which authorizes the departure is USSG § 4A1.3.

5

Although Mr. Bruton has 15 criminal history points, the two offenses which qualify him as a career offender occurred when he was 17 and 20 years old. See PSI ¶¶ 33 and 20. Within the exception of the instant offense, Mr. Bruton has no other felony convictions for crimes of violence or controlled substance offenses since his release from prison in 1996. The PSI also reflects that Mr. Bruton had a troubled and difficult upbringing. Mr. Bruton respectfully submits that a sentence pursuant to the career offender provisions would over-represent seriousness of his criminal history and the likelihood that he will commit future crimes. See United States v. Senior, 935 F.2d 149 (8th Cir. 1991).

In the Senior case, the Eighth Circuit upheld a districts court's downward departure from a career offender guideline range of 292-365 months to a mandatory minimum sentence of 120 months. Senior, 935 F.2d at 150-151. The Senior defendant was charged with possessing cocaine base in excess of 5 grams. His prior convictions included three prior robberies at age 20 and two controlled substance offenses at age 24. Id. Senior received a concurrent twelve-year sentence for the burglaries and a concurrent six-year sentence for the controlled substance offenses. The district court concluded it had the power to depart based upon USCG 4A1.3.

In affirming the district court's downward departure, the Eighth Circuit held that overstatement of the seriousness of the defendant's criminal history was a circumstance unusual enough to warrant departure. Id at 151. The Senior court reasoned that the district court properly considered the historical facts of the defendant's criminal career, including the defendant's age when committing the offenses and the state court's assessment of the seriousness of the crimes. Id.

Here, Mr. Bruton committed the two prior offenses which qualify him as a career offender at a young age within a relatively short period of time. Accordingly, under the rationale of Senior, this Court may downward depart from the career-offender provisions of the Sentencing Guidelines.

6

considered the historical facts of the defendant's criminal career, including the defendant's age when committing the offenses and the state court's assessment of the seriousness of the crimes. Id.

Here, Mr. Bruton committed the two prior offenses which qualify him as a career offender at a young age within a relatively short period of time. Accordingly, under the rationale of Senior, this Court may downward depart from the career-offender provisions of the Sentencing Guidelines. See also, United States v. Rivers, 50 F.3d 1126 (2d Cir. 1995) (sentencing judge may depart from offense level or criminal history category if career offender provisions over-represent seriousness of defendant's prior record); United States v. Fletcher, 15 F.3d 553 (6th Cir. 1994) (sentencing court may take age of prior convictions into account when considering defendant's likelihood or recidivism); United States v. Clark, 8 F.3d 839 (D.C. Cir. 1993) (sentence at guideline level without career offender increases not arbitrary where sentencing court decided that career offender over-represented defendant's criminal history); United States v. Bowser, 941 F.2d 1019 (10th Cir. 1991) (downward departure from career criminal status justified when defendant committed prior offenses at age 20 and received a concurrent sentence).

## Conclusion

Mr. Bruton is requesting that this Court reduce his offense level to level 14 because the conduct of the government informant in this case. But for the insistence of the informant, this case would involve between 25 and 50 grams of powder cocaine as opposed to 29.6 grams of crack cocaine. In addition, Mr. Bruton is requesting a departure along the vertical axis of the guideline table because the career offender status over-represents the seriousness of his prior criminal record

7

and the likelihood that he will commit further crimes.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By:

Daryl E. Wilcox
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 571962
1 East Broward Blvd., Sutie 1100
Fort Lauderdale, Florida 33301
(954) 356-7436 / 356-7556 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing instrument was mailed this 13th day of April,

2001 to Terrence Thompson, Assistant United States Attorney, 500 East Broward Boulevard, 7th

Floor, Fort Lauderdale, Florida, 33301 and Diedre Pratt, United States Probation Officer, 299 East

Broward Boulevard, Room 409, Fort Lauderdale, Florida 33301.

Daryl E. Wilcox

8

The following transcript is from the audio portion of the video that was recorded on March 9, 2009. The conversation is between Wayne BRUTTON and two cooperating sources thereafter identified as CS1 and CS2.

DEA Case # GS-00-9987
EXHIBIT X-2

Music playing in vehicle.
Final instructions given to CS1 and CS2 by DEA Special Agents.

| | |
|---|---|
| CS1 to CS2: | Put the phone in your pocket. |
| CS2 to CS1: | Chill out man. (UNINTELLIGIBLE) let me handle this. |
| CS1 to CS2. | Put that phone in your pocket. |
| CS2 to CS1: | Man, shut up and drive. (UNINTELLIGIBLE) |

CS1 and CS 2 at target location:

| | |
|---|---|
| CS1 to UM: | What's up? (UNINTELLIGIBLE) |
| CS1 to UM: | We owe Coe eight hundred, I mean at least so about to a grand (UNINTELLIGIBLE). |
| BRUTTON to CS2: | What's up? |
| CS2: | (UNINTELLIGIBLE) |
| BRUTTON to CS2: | What you want, a "BIRD". |
| CS2 to BRUTTON: | See, I was gonna take a sample, that's all, a sample. |
| BRUTTON: | (UNINTELLIGIBLE) |
| CS1 to BRUTTON: | What is that? |
| BRUTTON to CS2: | This cookable. This powder. |
| CS2 to BRUTTON: | Why you don't cook that up. |
| BRUTTON to CS2: | I don't know how to cook no powder, dog. You know I don't know how to cook, Bitch. I don't do nothing but cook |

**EXHIBIT 1**

(UNINTELLIGIBLE) in the house.

CS1 to BRITTON:    What is that there?

BRITTON to CS1 :    This ten grams here. That's real shit. I don't know how
(UNINTELLIGIBLE) though. You know I can't get
(UNINTELLIGIBLE) no cook dope.

CS1:    (UNINTELLIGIBLE).

CS2 to BRITTON:    You can't cook it right. See, when I, when I, the nigger say, I
got a nigger right there on Broward. (UNINTELLIGIBLE).
You know I'm doing this, I'm doing it now. That's what I told
" Stank" god dammit, don't worry about it, let her keep her
ass out of it, I don't need her in my business no how.

BRITTON on cell phone:    What up? Alright.

CS2 to CS1:    Listen man, keep your mouth closed, man don't want you in it,
god dammit.

CS2 to BRITTON:    Hey, check this out, listen, when I call you I'm gonna let you
know when I'm ready. Most likely, I probably get that two.

BRITTON to CS2:    Right

CS2 to BRITTON:    Most likely I will get that two. The way it went out,
(UNINTELLIGIBLE) right off the top, you know what I'm
saying, go head and handle your business. Like when I call
you, Im a tell you where to come at. Or, I'll come here.

BRITTON to CS2:    Right.

CS2 to BRITTON:    (UNINTELLIGIBLE).

BRITTON to CS2:    If they need a "bird", (UNINTELLIGIBLE), if you don't want
to (UNINTELLIGIBLE) I'll just meet you wherever, know
what I'm saying?

CS2 to BRITTON:    That be better, (UNINTELLIGIBLE) I'll get it from you. Hey,
how you got the key, wrapped?

BRITTON to CS2:    Already, everything wrapped, all that shit pressed and
stamped. That's how we do it, like them Haitians be doing.